UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| | |
|---|---|
| Jessica Gouwens, individually and on behalf of all others similarly situated,<br><br>    Plaintiff,<br><br>  - against -<br><br>Target Corporation,<br><br>    Defendant | 3:22-cv-50016<br><br><br>First Amended<br>Class Action Complaint<br><br>Jury Trial Demanded |

Plaintiff alleges upon information and belief, except for allegations pertaining to Plaintiff, which are based on personal knowledge:

  1. Target Corporation ("Defendant") manufactures, labels, markets, and sells fruit punch flavored concentrated liquid under its Market Pantry brand, purporting to get its fruit punch taste from natural flavorings ("Product").



I.  **CONSUMER DEMAND FOR NATURAL FLAVORS**

2. Consumers are increasingly concerned about the ingredients added to what they eat and drink.

3. Within the spectrum of artificial ingredients, consumers are especially focused on and seek to avoid artificial flavors and seek products with only natural flavors.[1]

4. Natural flavor is defined as "essential oil, oleoresin, essence or extractive" from a fruit, vegetable or other natural source made through "roasting, heating or enzymolysis." 21 C.F.R § 101.22(a)(3).

5. In contrast, artificial flavor refers to flavoring substances derived from non-natural sources. 21 C.F.R § 101.22(a)(1).

6. According to the Wall Street Journal, "As consumer concern rises over artificial ingredients, more food companies are reconstructing recipes" to remove artificial flavors.[2]

7. According to Paul Manning, chief executive officer and president of Sensient Technologies, "Consumer desire for naturally flavored products is an emerging trend."[3]

8. Explanations for why consumers prefer foods containing natural, instead of artificial flavors, are varied.

9. A recent survey reported that over 82% of US respondents believe that foods with artificial flavors are less healthy than those promoted as containing natural flavors and/or not containing artificial flavors.

10. Consumers seek to avoid artificial flavors because they are weary of ingredients

---

[1] Alex Smolokoff, Natural color and flavor trends in food and beverage, Natural Products Insider, Oct. 11, 2019; Thea Bourianne, Exploring today's top ingredient trends and how they fit into our health-conscious world, March 26-28, 2018; Nancy Gagliardi, Consumers Want Healthy Foods – And Will Pay More For Them, Forbes, Feb 18, 2015.
[2] Lauren Manning, How Big Food Is Using Natural Flavors to Win Consumer Favor, Wall Street Journal.
[3] Keith Nunes, Using natural ingredients to create authentic, fresh flavors, Food Business News, Sept. 20, 2018.

2

which are highly processed with chemical additives and synthetic solvents in laboratories.

11. According to Nielsen, the absence of artificial flavors is very important for over 40% of respondents to their Global Health & Wellness Survey.

12. One scholar theorized "the preference for natural products appeals to a moral ideology and offers a moral satisfaction."[4]

13. The trade journal, Perfumer & Flavorist, described "The Future of Artificial Flavors & Ingredients" as bleak, given consumer opposition to these synthetic ingredients.[5]

14. Mintel announced that consumer avoidance of artificial flavors is just as strong as their desire for natural flavors, in its Report, "Artificial: Public Enemy No. 1."[6]

15. About half of Americans say they seek out natural flavors at least some of the time.

16. In contrast, artificial flavors were sought out by only about one in 10 consumers, with approximately half saying they avoid each of them at least some of the time.

17. Nielsen reported that 62% of consumers try to avoid artificial flavors.

18. New Hope Network concluded that 71% of consumers avoid artificial flavors.

19. Label Insight determined that 76% of consumers avoid artificial flavors.

20. A recent survey shows more than three in four people worldwide are convinced that artificial flavors have no place on their ingredient lists.[7]

21. According to Forbes, 88% of consumers consider foods without artificial flavors to be more natural and healthier than foods with artificial flavors and would pay more for such foods.

---

[4] Rozin, P., Spranca, M., Krieger, Z., Neuhaus, R., Surillo, D., Swerdlin, A., & Wood, K. (2004). Preference for natural: Instrumental and ideational/moral motivations, and the contrast between foods and medicines. Appetite, 43(2), 147–154. doi:10.1016/j.appet.2004.03.005.
[5] Jim Kavanaugh, The Future of Artificial Flavors & Ingredients, Perfumer & Flavorist, June 12, 2017.
[6] Alex Smolokoff, Natural color and flavor trends in food and beverage, Natural Products Insider, Oct. 11, 2019; Thea Bourianne, Exploring today's top ingredient trends and how they fit into our health-conscious world, March 26-28, 2018; Nancy Gagliardi, Consumers Want Healthy Foods – And Will Pay More For Them, Forbes, Feb 18, 2015.
[7] What 'Natural' Really Means to Consumers GNT Group's Guide to Global Consumer Demands attests importance of natural colors for future-proof products, July 13, 2017.

3

**II. COMPONENTS OF TASTE**

22. A flavor is a substance the function of which is to impart taste. *See* 21 C.F.R. § 101.22(a)(1), (3).

23. Taste is the combination of sensations arising from specialized receptor cells located in the mouth.[8]

24. Taste can be defined as sensations of sweet, sour, salty, bitter, and umami.

25. However, limiting taste to five categories suggests that taste is simple, which is not true.

26. For example, the taste of sour includes the sourness of vinegar (acetic acid), sour milk (lactic acid), lemons (citric acid), apples (malic acid), and wines (tartaric acid).

27. Each of those acids is responsible for unique sensory characteristics of sourness.

28. Fruit flavors are the sum of the interaction between sugars, acids, and volatile compounds.[9]

29. Fruit punch refers to a beverage made from a variety of fruits, including apple, cherry, orange, pineapple, peach, grape and pear.

30. Consumer acceptability of the flavors of these fruits are based on their perceived sweetness and tartness, determined by their sugar to acid ratio.

31. Sugars, mainly glucose and fructose, and their ratio to acids, such as citric and malic acid, determine the sweetness of fruits.

32. The table below identifies the main acids in numerous fruits.

| Fruit | Predominant Acid | Secondary Acids |
|---|---|---|
| Apple | Malic Acid (95%) | Tartaric Acid, Fumaric Acid |

---

[8] Gary Reineccius, Flavor Chemistry and Technology § 1.2 (2d ed. 2005).
[9] Y.H. Hui, et al., Handbook of Fruit and Vegetable Flavors, p. 693 (2010).

| | | |
|---|---|---|
| Apricot | Malic Acid (70%) | Citric Acid, Tartaric Acid |
| Blackberry | Citric Acid | Malic Acid |
| Blueberry | Citric Acid | Malic Acid, Quinic Acid |
| Cherry | Malic Acid (94%) | Tartaric Acid |
| Cherry (Tropical) | Malic Acid (32%) | Citric Acid |
| Grape | Malic Acid (60%) | Tartaric Acid |
| Grapefruit | Citric Acid | Malic Acid |
| Guava | Citric Acid | Malic Acid |
| Lime, Lemon | Citric Acid | Malic Acid |
| Mango | Citric Acid | Malic Acid, Tartaric Acid |
| Orange | Citric Acid | Malic Acid |
| Peach | Malic Acid (73%) | Citric Acid |
| Pear | Malic Acid (77%) | Citric Acid |
| Pineapple | Citric Acid | Malic Acid |
| Pomegranate | Malic Acid (>50%) | Citric Acid (>22%) |
| Raspberry | Citric Acid | Malic Acid, Tartaric Acid |
| Strawberry | Citric Acid | Malic Acid, Tartaric Acid |
| Tamarind | Tartaric Acid | Citric Acid, Malic Acid |
| Watermelon | Malic Acid (99%) | Fumaric Acid |

33. In apples, cherries, grapes, peaches and pears, malic acid is the most significant fruit acid.

34. In oranges and pineapples, malic acid is the second most significant fruit acid.

35. Regardless of the fruits used for any specific fruit punch, almost all of them contain malic acid, which provides their fruity, sweet, tart and sour taste.

### III. CHEMICAL STRUCTURE OF MALIC ACID

36. Malic acid (molecular formula $C_4H_6O_5$) is the common name for 1-hydroxy-1, 2-ethanedicarboxylic acid.

5

37. Malic acid has two isomers, or different arrangements of atoms in the molecule, L-malic acid, and D-malic acid. 21 C.F.R. § 184.1069.

38. An isomer is a molecule sharing the same atomic make-up as another but differing in structural arrangements.

39. Stereoisomers contain different types of isomers, each with distinct characteristics that separate each other as different chemical entities with different chemical properties.

40. Stereoisomers differ from each other by spatial arrangement, meaning different atomic particles and molecules are situated differently in any three-dimensional direction by even one degree.

41. An enantiomer is a type of stereoisomer that is a mirror-image and cannot be superimposed.

42. Enantiomers are like right and left-hand versions of the same molecular formula.

43. D-Malic Acid and L-Malic Acid are enantiomers.

44. Below are skeletal formulas of the enantiomers D-Malic Acid and L-Malic Acid.



45. L-Malic Acid occurs naturally in various fruits and is known for providing sweetness and tartness, among other flavors.

46. D-Malic Acid does not occur naturally.

47. D-Malic Acid is most commonly found as a racemic mixture of the D isomer and L isomer, DL-Malic Acid, which is commercially made from petroleum products.

## IV. ADDITION OF DL-MALIC ACID

48. Adding DL-Malic Acid to a solution of natural flavorings containing L-Malic Acid changes the concentration of malic acid in the solution and the ratio of total malic acid to sugars in that solution.

49. Natural sugars – like glucose, fructose, and sucrose – combined with artificial DL-Malic Acid in a ratio engineered to resemble the natural chemical combination of sugar and L-Malic Acid found in the fruits which make up fruit punch is not equivalent to the natural flavors of those fruits.

50. A natural chemical combination of sugar and L-Malic Acid, altered by adding artificial DL-Malic Acid, is no longer equivalent to the original chemical combination of sugar and L-Malic Acid, and therefore no longer the natural flavors of the fruits which make up fruit punch.

51. Defendant includes DL-Malic Acid to make the Product taste tart, sweet and fruity, like the fruit combination tastes naturally.

52. Defendant adds artificial DL-Malic Acid to the Product to provide the sweet, fruity, and tart taste that consumers associate with fruit punch.

53. Defendant had the option to add naturally extracted L-Malic Acid, a naturally manufactured acid such as citric acid, or natural fruit flavors, but used artificial DL-Malic Acid because it was more cost-effective and/or more accurately resembled the natural fruit punch flavors than citric or other acids.

54. DL-Malic Acid is synthetically produced from petroleum in a high-pressure, high-temperature, catalytic process.

55. Since there are natural and artificial types of malic acid, laboratory analysis is required to identify which type was used in the Product.

56. Laboratory analysis concluded the Product contains artificial, DL-Malic Acid, instead of natural, L-Malic Acid.

## V. LABELING OF PRODUCT IS MISLEADING

57. Federal and identical state regulations require the Product to disclose whether its characterizing fruit punch flavor is from the fruits which comprise the fruit punch mix, natural sources other than these fruits, and/or from artificial, chemical sources. 21 C.F.R. § 101.22(i).

58. The statement, "Natural Flavor With Other Natural Flavors" directly below "Fruit Punch" tells consumers the Product's fruit punch taste is from (1) natural flavor derived from the fruit ingredients used, i.e., natural cherry flavor or natural apple flavor, and (2) natural flavor from natural sources other than the fruit ingredients used in making the fruit punch flavor, i.e., natural blueberry flavor or natural pomegranate flavor. 21 C.F.R. § 101.22(i)(1)(iii).



59. This representation about the Product's fruit punch taste appeals to the more than seven out of ten consumers who avoid artificial flavors.

8

60. Consistent with the front label, the ingredient list identifies "Natural Flavors."

**INGREDIENTS:** WATER, MALIC ACID, CITRIC ACID, LESS THAN 2% OF: NATURAL FLAVORS, SUCRALOSE, ACESULFAME POTASSIUM, POTASSIUM CITRATE, GUM ARABIC, RED 40, SUCROSE ACETATE ISOBUTYRATE, NIACINAMIDE (VITAMIN B3), PYRIDOXINE HYDROCHLORIDE (VITAMIN B6), CYANOCOBALAMIN (VITAMIN B12), POTASSIUM SORBATE (PRESERVATIVE).

61. The ingredients identify "Malic Acid" as the second most predominant ingredient by weight, an amount greater than the "Natural Flavors," which is less than two percent.

62. Consumers who view the ingredients are not told this malic acid is "DL-Malic Acid," even though federal and state regulations require it be listed by its specific instead of generic name. 21 C.F.R. § 101.4(b).

63. Since the Product's fruit punch taste is provided by natural flavors and DL-Malic Acid, an artificial flavoring ingredient, the front label is required to disclose the presence of natural and artificial flavor, such as "Natural and Artificial Fruit Punch Flavor." 21 C.F.R. § 101.22(i)(1), 21 C.F.R. § 101.22(i)(2).

64. Defendant's omission of any reference to artificial flavor on the front label and ingredient list was misleading and caused consumers like Plaintiff to expect the fruit punch taste was only from natural flavors.

65. DL-Malic Acid is not a "natural flavor" because it is not derived from a fruit, vegetable or other natural source.

9

66. A combination of sugar and DL-Malic Acid in a ratio resembling the taste of fruit cannot be derived from a fruit or vegetable.

67. A combination of sugar, natural L-Malic Acid, and artificial DL-Malic Acid combined in a way to resemble the natural ratio of sugar and L-Malic Acid found in the fruit ingredients used in fruit punch cannot be derived from a fruit, vegetable or other natural source.

68. A combination of sugars and artificial DL-Malic Acid engineered to resemble the natural ratio of sugars and natural L-Malic Acid that make up the natural flavors of the fruits used in fruit punch is not a natural flavor.

69. The natural flavors of the fruits used in fruit punch are heavily dependent on a specific ratio of sugar and L-Malic Acid, while the Product's flavor depends upon a ratio of sugar and DL-Malic Acid.

70. DL-Malic Acid could function as a flavor enhancer or PH balancer, depending on its application.

71. A flavor enhancer is "added to supplement, enhance, or modify the original taste and or aroma of a food without imparting a characteristic taste or aroma of its own." 21 C.F.R. § 170.3(o)(11).

72. For example, malic acid added to vinegar (ascetic acid) dishes like barbecue pork, coleslaw, or pickled eggs would not fundamentally alter the underlying vinegar flavor.

73. However, because the flavor imparted by malic acid is a core component of the fruit components of fruit punch, DL-Malic Acid does not function as a flavor enhancer.

74. Artificial DL-Malic Acid fundamentally alters the original combination of sugar and natural L-Malic Acid core to the flavors of the fruits used in fruit punch, so that the Product's flavor is no longer a natural ratio of sugar and L-Malic Acid but instead an artificial ratio of sugar

10

and DL-Malic Acid.

75. PH balancers are "substances added to change or maintain active acidity or basicity, including buffers, acids, alkalis, and neutralizing agents." 21 C.F.R. § 170.3(o)(23).

76. The Product does not use DL-Malic Acid as a PH balancer because there is no need to change or maintain its active acidity or basicity.

77. Irrespective of the purpose for which DL-Malic Acid was added, its effect on the Product's fruit punch taste is the same.

78. Plaintiff and consumers were unable to learn the malic acid used was the artificial version without laboratory testing.

## VI. CONCLUSION

79. Defendant makes other representations and omissions with respect to the Product which are false and/or misleading.

80. Reasonable consumers must and do rely on a company to honestly identify and describe the components, attributes, and features of a product, relative to itself and other comparable products or alternatives.

81. The value of the Product that Plaintiff purchased was materially less than the value as represented by Defendant.

82. Defendant sold more of the Product and at higher prices than it would have in the absence of this misconduct, resulting in additional profits at the expense of consumers.

83. Had Plaintiff known the truth, she would not have bought the Product or would have paid less for it.

84. As a result of the false and misleading representations, the Product is sold at a premium price, approximately no less than $1.99 per 1.62 OZ or 24 servings, excluding tax and

sales, higher than similar products, represented in a non-misleading way, and higher than it would be sold for absent the misleading representations and omissions.

<div align="center">Jurisdiction and Venue</div>

85. Jurisdiction is based on the Class Action Fairness Act of 2005 ("CAFA"). 28 U.S.C. § 1332(d)(2).

86. The aggregate amount in controversy exceeds $5 million, including any statutory damages, exclusive of interest and costs.

87. Plaintiff Jessica Gouwens is a citizen of Illinois.

88. Defendant Target Corporation is a Minnesota corporation with a principal place of business in Minneapolis, Hennepin County, Minnesota.

89. The members of the class Plaintiff seeks to represent are more than 100, because the Product has been sold for several years, in hundreds of locations, in the states covered by Plaintiff's proposed classes.

90. Defendant transacts business within this District through sale of the Product to residents of this District, from Defendant's retail stores and website.

91. Venue is in this District because Plaintiff resides in this District and the actions giving rise to the claims occurred within this District, Plaintiff's exposure to the representations and awareness of the issues described here.

92. This action is properly assigned to the Western Division of this District because a substantial part of the events or omissions giving rise to these claims occurred in McHenry County, i.e., Plaintiff's purchase, consumption and use of the Product and her awareness and/or experiences of and with the issues described here.

Parties

93. Plaintiff Jessica Gouwens is a citizen of Huntley, McHenry County, Illinois.

94. Defendant Target Corporation is a Minnesota corporation with a principal place of business in Minneapolis, Minnesota, Hennepin County.

95. Founded as the Dayton Dry Goods Company by George D. Dayton in 1902, Target has almost 2,000 stores in the United States.

96. Dayton's principles shaped the future of Target, as he was committed to "the higher ground of stewardship," which meant dependable merchandise and fair business practices.

97. Target was one of many "upscale" discount stores which emerged in the 1960s.

98. One of Target's defining features was experimenting with new retail concepts.

99. For example, Target developed B. Dalton, the country's largest bookstore during the 1970s and 1980s.

100. Target has been known for its values and unique approach to business and community, through its ethics, transparency to investors and customers, and philanthropy.

101. While Target stores sell leading national brands, they also sell a large number of products under one of their private label brands, Market Pantry.

102. Private label products are made by third-party manufacturers and sold under the name of the retailer, or its sub-brands.

103. Previously referred to as "generic" or "store brand," private label products have increased in quality, and often are superior to their national brand counterparts.

104. Products under the Market Pantry brand have an industry-wide reputation for quality and value.

105. In releasing products under the Market Pantry brand, Defendant's foremost criteria

was to have high-quality products that were equal to or better than the national brands.

106. Defendant is able to get national brands to produce its private label items due its loyal customer base and tough negotiating.

107. That Market Pantry branded products met this high bar was proven by focus groups, which rated them above the name brand equivalent.

108. Private label products generate higher profits for retailers because national brands spend significantly more on marketing, contributing to their higher prices.

109. A survey by The Nielsen Co. "found nearly three out of four American consumers believe store brands are good alternatives to national brands, and more than 60 percent consider them to be just as good."

110. Private label products under the Market Pantry brand benefit by their association with consumers' appreciation for the Target brand as a whole.

111. The development of private label items is a growth area for Target, as they select only top suppliers to develop and produce Market Pantry products.

112. The Product is available to consumers in this District from Defendant's retail stores and website.

113. Plaintiff purchased the Product on one or more occasions within the statutes of limitations for each cause of action alleged, at Target, at locations including 750 S Randall Rd Algonquin IL 60102-5915 between December 2020 and June 2021, among other times.

114. Plaintiff believed the Product's fruit punch taste was only from natural flavoring ingredients and not from artificial flavoring ingredients because that is what the representations said and implied.

115. Plaintiff relied on the words, coloring, descriptions, layout, and packaging on the

Product, on the labeling, statements, omissions, and/or claims made by Defendant or at its directions, in digital, print and/or social media, which accompanied the Product and separately, through in-store, digital, audio, and print marketing.

116. Plaintiff was disappointed because she believed the Product contained only natural flavoring ingredients and did not contain artificial flavoring ingredients.

117. Plaintiff attempts to purchase and consume products without artificial flavoring because she believes they have potentially negative health effects compared to natural flavorings.

118. Plaintiff bought the Product at or exceeding the above-referenced price.

119. Plaintiff would not have purchased the Product if she knew the representations and omissions were false and misleading or would have paid less for it.

120. Plaintiff chose between Defendant's Product and products represented similarly, but which did not misrepresent their attributes, features, and/or components regarding their flavoring.

121. Plaintiff intends to, seeks to, and will purchase the Product again when she can do so with the assurance its representations are consistent with its attributes and/or composition.

122. Plaintiff is unable to rely on the labeling and representations not only of this Product, but for other similar water enhancers marketed as getting their main flavor from only natural flavoring ingredients, because she is unsure whether those representations are truthful.

## Class Allegations

123. Plaintiff seeks certification under Fed. R. Civ. P. 23 of the following classes:

> **Illinois Class:** All persons in the State of Illinois who purchased the Product during the statutes of limitations for each cause of action alleged; and
>
> **Consumer Fraud Multi-State Class**: All persons in the States of Michigan, Texas, Arkansas, Delaware, Wyoming, Virginia, and Oklahoma who purchased the Product during the statutes of limitations for each

15

Case: 3:22-cv-50016 Document #: 19 Filed: 06/22/22 Page 16 of 20 PageID #:98

cause of action alleged.

124. Common questions of issues, law, and fact predominate and include whether Defendant's representations were and are misleading and if Plaintiff and class members are entitled to damages.

125. Plaintiff's claims and basis for relief are typical to other members because all were subjected to the same unfair and deceptive representations and actions.

126. Plaintiff is an adequate representative because her interests do not conflict with other members.

127. No individual inquiry is necessary since the focus is only on Defendant's practices and the class is definable and ascertainable.

128. Individual actions would risk inconsistent results, be repetitive and are impractical to justify, as the claims are modest relative to the scope of the harm.

129. Plaintiff's counsel is competent and experienced in complex class action litigation and intends to protect class members' interests adequately and fairly.

130. Plaintiff seeks class-wide injunctive relief because the practices continue.

<p style="text-align:center;">Illinois Consumer Fraud and Deceptive Business Practices Act
("ICFA"), 815 ILCS 505/1, et seq.

(Consumer Protection Statute)</p>

131. Plaintiff incorporates by reference all preceding paragraphs.

132. Plaintiff and class members desired to purchase a product that got its characterizing or main taste from natural flavoring ingredients and not artificial flavoring ingredients.

133. Defendant's false and deceptive representations and omissions are material in that they influenced consumer purchasing decisions, including Plaintiff's.

134. Defendant misrepresented the Product through statements, omissions, ambiguities,

16

half-truths and/or actions.

135. Plaintiff relied on the representations that the Product's fruit punch taste was due to natural flavoring ingredients and not artificial flavoring ingredients.

136. Plaintiff and class members would not have purchased the Product or paid as much if the true facts had been known, suffering damages.

## Violation of State Consumer Fraud Acts

### (On Behalf of the Consumer Fraud Multi-State Class)

137. The Consumer Fraud Acts of the States in the Consumer Fraud Multi-State Class are similar to the above-referenced consumer protection statute and prohibit the use of unfair or deceptive business practices in the conduct of trade or commerce.

138. The members of the Consumer Fraud Multi-State Class reserve their rights to assert their consumer protection claims under the Consumer Fraud Acts of the States they represent and/or the consumer protection statute invoked by Plaintiff.

139. Defendant intended that each of the members of the Consumer Fraud Multi-State Class would rely upon its deceptive conduct, and a reasonable person would in fact be misled by this deceptive conduct.

140. As a result of Defendant's use or employment of artifice, unfair or deceptive acts or business practices, each of the members of the Consumer Fraud Multi-State Class have sustained damages in an amount to be proven at trial.

141. Defendant's conduct showed motive and a reckless disregard of the truth such that an award of punitive damages is appropriate.

## Breach of Express Warranty

142. The Product was manufactured, identified, and sold by Defendant and expressly

warranted to Plaintiff and class members that its characterizing or main taste was from natural flavoring ingredients and not artificial flavoring ingredients.

143. Defendant directly marketed the Product to Plaintiff and consumers through its advertisements and marketing, through various forms of media, on the packaging, in print circulars, direct mail, and targeted digital advertising.

144. Defendant knew the product attributes that potential customers like Plaintiff were seeking and developed its marketing and labeling to directly meet those needs and desires.

145. Defendant's representations affirmed and promised that the Product's characterizing or main taste was from natural flavoring ingredients and not artificial flavoring ingredients.

146. Plaintiff recently became aware of Defendant's breach of the Product's express warranty.

147. Plaintiff provided or will provide notice to Defendant, its agents, representatives, retailers, and their employees.

148. Plaintiff hereby provides notice to Defendant that it breached the express warranty associated with the Product.

149. Defendant received notice and should have been aware of these issues due to complaints by third-parties, including regulators, competitors, and consumers, to its main offices, and by consumers through online forums.

150. The Product did not conform to its affirmations of fact and promises due to Defendant's actions.

151. Plaintiff and class members would not have purchased the Product or paid as much if the true facts had been known, suffering damages.

### Fraud

152. Defendant misrepresented and/or omitted the attributes and qualities of the Product, that its characterizing or main flavors were from natural flavoring ingredients and not artificial flavoring ingredients.

153. The records Defendant is required to maintain provided it with actual and constructive knowledge of the falsity or deception.

154. Defendant knew of the issues described here yet did not address them.

155. Defendant's fraudulent intent is evinced by its knowledge that the Product was not consistent with its representations.

### Jury Demand and Prayer for Relief

Plaintiff demands a jury trial on all issues.

**WHEREFORE**, Plaintiff prays for judgment:

1. Declaring this a proper class action, certifying Plaintiff as representative and the undersigned as counsel for the class;
2. Entering preliminary and permanent injunctive relief by directing Defendant to correct the challenged practices to comply with the law;
3. Injunctive relief to remove, correct and/or refrain from the challenged practices and representations, and restitution and disgorgement for members of the proposed classes pursuant to the applicable laws;
4. Awarding monetary damages, statutory and/or punitive damages pursuant to any statutory claims and interest pursuant to the common law and other statutory claims;
5. Awarding costs and expenses, including reasonable fees for Plaintiff's attorneys and experts; and

6. Other and further relief as the Court deems just and proper.

Dated: June 22, 2022

                                                           Respectfully submitted,

                                                           /s/Spencer Sheehan
                                                           Sheehan & Associates, P.C.
                                                           Spencer Sheehan
                                                           60 Cuttermill Rd Ste 412
                                                           Great Neck NY 11021
                                                           Tel: (516) 268-7080
                                                           spencer@spencersheehan.com